**UNITED STATES, Appellee,**

v.

**Lindsey SCOTT, Corporal, U.S. Marine Corps, Appellant.**

No. 54253.
NMCM 84–0447.

U.S. Court of Military Appeals.

July 6, 1987.

For Appellant: *Gary Myers, Esq.* and *John F. Leino, Esq.* (argued); *Captain David C. Larson, JAGC, USN* (on brief).

For Appellee: *Captain H.C. Lassiter, USMCR* (argued); *Captain Carl H. Horst, JAGC, USN* (on brief); *Captain Wendell A. Kjos, JAGC, USN, Lieutenant Colonel L.F. Henley, Jr., USMC, Commander Mi-*

chael P. Green, JAGC, USN, Lieutenant Commander John B. Holt, JAGC, USN.

## Opinion of the Court

COX, Judge:

Contrary to his pleas, appellant was convicted by a general court-martial, composed of officer members, of attempted murder, rape, forcible sodomy, and kidnapping, in violation of Articles 80, 120, 125, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 920, 925, and 934, respectively. His sentence to confinement for 30 years, forfeiture of $500.00 pay per month for 36 months, reduction to E–1, and a dishonorable discharge was approved by the convening authority.[1] On June 18, 1984, the United States Navy-Marine Corps Court of Military Review returned the case to the convening authority for an evidentiary hearing in accordance with *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967), on the issue of ineffective assistance of defense counsel. 18 M.J. 629. Upon conclusion of the hearing on March 1, 1985, the record was returned to the Court of Military Review for further review. On January 22, 1986, with one judge dissenting, the Court of Military Review affirmed the findings and sentence. 21 M.J. 889.

This Court granted review of these two related issues:

### I

WHETHER APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE OF COUNSEL'S FAILURE TO INVESTIGATE, PREPARE, AND PRESENT HIS SOLE DEFENSE OF ALIBI.

### II

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW COMMITTED PREJUDICIAL ERROR BY INCORRECTLY APPLYING THE TEST FOR PREJUDICE ESTABLISHED BY THE UNITED STATES SUPREME COURT IN *STRICKLAND V. WASHINGTON*.

We hold that the standard for review of claims of ineffective assistance of counsel in trials by courts-martial is that set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Applying the *Strickland* standard to the facts of this case, we hold that civilian counsel's performance was deficient and prejudiced the defense.

Appellant was represented at trial by Mr. Ervan E. Kuhnke, Jr., a civilian lawyer personally retained by him, and Major A. J. Roach, U. S. Marine Corps, his detailed military counsel. All parties considered the civilian attorney to be the lead counsel, with the military lawyer acting as associate counsel. After trial, appellant discharged his civilian attorney and retained the services of other civilian counsel. Affidavits were then filed with the Court of Military Review alleging, among other things, that alibi witnesses were not interviewed by a defense representative until 5 months after appellant's lawyer was on notice of a potential alibi defense and that neither civilian nor military counsel interviewed any alibi witnesses prior to trial. An evidentiary hearing was ordered to determine the extent of assistance provided by defense counsel to appellant. Before this Court, as well as the Court of Military Review, the thrust of appellant's attack on the adequacy of counsel centers on the civilian attorney's failure to prepare and present an effective alibi defense, although an alibi defense was available and alibi was selected by counsel as the *sole* defense.

### A

#### Proper Standard for Reviewing Ineffectiveness Claims

■ By virtue of Article 27, UCMJ, 10 U.S.C. § 827, as well as the Sixth Amendment of the Constitution, a military accused is guaranteed the effective assist-

1. · While the record states that "[t]he original charge sheet shall be inserted at this point in the record" (R.6), that was not done. *See United States v. Towers,* 24 M.J. 143 n.1 (C.M.A. 1987).

ance of counsel. *United States v. DiCupe,* 21 M.J. 440 (C.M.A.), *cert. denied,* —— U.S. ——, 107 S.Ct. 101, 93 L.Ed.2d 52 (1986); *United States v. Wattenbarger,* 21 M.J. 41 (C.M.A. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986); *United States v. Jefferson,* 13 M.J. 1 (C.M.A. 1982); *United States v. Rivas,* 3 M.J. 282 (C.M.A. 1977). This guarantee applies whether counsel is detailed, or selected by the accused. *United States v. Walker,* 21 U.S.C.M.A. 376, 45 C.M.R. 150 (1972).

This Court has followed the standards utilized by the federal courts in evaluating claims of ineffective assistance of counsel, stating that an accused is entitled to "reasonably competent counsel" and requiring a showing of "serious incompetency" which affected the trial result in order to reverse a conviction. *See United States v. DiCupe, supra* at 442; *United States v. Jefferson, supra* at 5; and *United States v. Rivas, supra* at 288.

■ In *Strickland v. Washington, supra,* the Supreme Court for the first time set forth a test for reviewing claims of ineffective assistance of counsel. The two-pronged test articulated in *Strickland* has been applied by the Courts of Military Review and is compatible with existing military standards. *See United States v. Haston,* 21 M.J. 559 (A.C.M.R. 1985); *United States v. Huxhold,* 20 M.J. 990 (N.M.C. M.R. 1985); *United States v. Rogan,* 19 M.J. 646 (A.F.C.M.R. 1984). In order to prevail on an ineffectiveness of counsel claim, an accused must establish both incompetence and prejudice, as follows:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S.Ct. at 2064.

■ The competence of counsel is presumed. To make out a claim of ineffective assistance of counsel, the accused must rebut this presumption by pointing out specific errors made by his defense counsel which were unreasonable under prevailing professional norms. *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. "In making [the competence] determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." 466 U.S. at 690, 104 S.Ct. at 2066.

■ Because "[i]nvestigation is an essential component of the adversary process," *Wade v. Armontrout,* 798 F.2d 304, 307 (8th Cir. 1986), that testing process generally will not function properly unless defense counsel has done some investigation. Thus, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary ... [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington, supra* 466 U.S. at 691, 104 S.Ct. at 2066.

The purpose of guaranteeing effective assistance "of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id.* at 691–92, 104 S.Ct. at 2067. Consequently, even unprofessional errors by counsel do not justify setting aside a conviction unless the deficient conduct "actually had an adverse effect on the defense." Requiring an accused to affirmatively establish prejudice is justified because:

The government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence. Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.

*Id.* at 693, 104 S.Ct. at 2067.

■ The test for prejudice when a conviction is challenged on the basis of actual ineffectiveness of counsel "is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington, supra* at 695, 104 S.Ct. at 2068–69. This requires a court to consider the totality of the evidence before the factfinder.

## B

### Pretrial Investigation

On April 21, 1983, appellant became aware that he was a suspect in the abduction, sodomy, rape, and attempted murder of Mrs. Wendy Street, the wife of a fellow Marine. These crimes occurred between 8 and 9 p.m. on April 20, 1983. Two days later, on April 22, appellant retained Mr. Kuhnke, an attorney practicing in Dumfries, Virginia, to represent him. At the first meeting with his lawyer, appellant told him the facts supporting an alibi defense. Appellant had already made a statement to the Naval Investigative Service (NIS) wherein he detailed an account of his movements during the time frame of the offenses.

Appellant provided his lawyer and NIS with basically the same itinerary. He claimed that on the evening of April 20 he visited Dumfries Pharmacy, Zayre's, and Quickee Drive-In, all in the Dumfries-Woodbridge, Virginia, area. At the pharmacy, he purchased a foot massager as a birthday present for his wife. He departed the pharmacy at approximately 8 p.m. and went to Zayre's, where he browsed for 15 to 20 minutes and purchased a coke at the soda fountain. The clerk who served him the coke was called "Pam." After he left Zayre's, he stopped briefly at the Quickee Drive-In and then went home.

NIS reports indicate that a clerk at Dumfries Pharmacy was interviewed on April 22. She confirmed that appellant was in the store on April 20th between 7:30 and 8 p.m., and that he purchased a foot massager. On April 28, an NIS agent interviewed Ms. Pam Biller, who was working at the Zayre's soda fountain on the night of April 20. When she was shown a black and white photograph of appellant, she indicated that she did not recognize him. On May 4, an NIS agent interviewed three employees of Quickee Drive-In. None of them recognized a photograph of appellant.

The investigation under Article 32, UCMJ, 10 U.S.C. § 832, was held on June 1, 1983. About 3 weeks later, the Article 32 investigating officer completed his report, recommending trial by general court-martial. On August 10, 1983, the convening authority referred the charges to a general court-martial.

In mid-September appellant unilaterally sought the assistance of Ms. Lori Jackson, whose name he had read in the paper. She agreed to help and called Mr. Kuhnke to volunteer her services as an investigator. Although she was not a trained or licensed investigator, the attorney readily accepted her offer of assistance. She set about retracing appellant's steps on the night of April 20th in an attempt to find someone who could identify him. By this time, 5 months had elapsed since the crimes.

Armed with several photographs of appellant, she interviewed Ms. Biller of Zayre's. Although Ms. Biller had been unable to identify appellant from the mug shot shown to her by an NIS agent in April, she told Ms. Jackson that she recognized appellant as having been in the store

based on the other, more varied pictures then shown to her. She could not, however, pin down the date to April 20. Ms. Jackson informed Ms. Biller that Mr. Kuhnke would be contacting her, but he did not do so.

Ms. Jackson uncovered another potential alibi witness, Ms. Cynthia Ausby, who was on duty at Zayre's on April 20 as the chief security officer. Ms. Ausby recognized appellant from his photograph and stated that he had been in the store one night in the spring at about 8:15 p.m. Ms. Jackson arranged a confrontation with appellant in the store parking lot and Ms. Ausby confirmed her identification of appellant and the clothes he was wearing in the store. She could not pinpoint the date as April 20, however. Ms. Jackson informed Ms. Ausby that Mr. Kuhnke would be contacting her, but he did not do so.

### C

### *The Trial*

Trial commenced on October 3, 1983. In his opening statement, Mr. Kuhnke maintained that the defense would introduce evidence to "place the Corporal at a location at a time which ... makes it impossible for him to have committed these offenses." He specifically referred to the anticipated testimony of the security guard, stating that she would testify that appellant was some 15 miles away at the time of the crime, "putting him in a position where he could not have committed the crime."

The government counsel competently presented evidence establishing that Mrs. Street, the wife of a military policeman, was the victim of a vicious and premeditated attack.[2] Mrs. Street testified that she was set up by a phone call to her apartment at 8:15 p.m., on April 20, 1983. The caller told her that her husband had been injured and taken to the hospital. She was told that a car would be sent to pick her up outside her apartment to take her to her husband. She was picked up a few minutes later and driven to an isolated location on or near the Marine Corps Development and Education Command at Quantico, Virginia. The driver pulled a knife and forced her to commit fellatio and then raped her. During the rape, he referred to her husband by his surname.

She testified that her assailant then forced her out of the car and ordered her to lie down on the ground, where he choked her into unconsciousness. When she regained consciousness, she realized that she had been slashed in the neck with the knife and apparently left for dead. She was able to walk along the road until she could flag down a passing car for assistance.

> She described her assailant as follows: He was a black man. He wore glasses. He looked ... to be between the ages of ... 24 to 26 or 27, 28. He was medium built. He had a Marine cut hair—a Marine style haircut. He had no facial hair; you know, he was shaved. He looked to me to be about ... anywhere from five, six, to five, eight.

After two equivocal identifications of him at pretrial line-ups, at trial Mrs. Street positively identified appellant as her assailant. She also identified his car as very similar to the one in which she was abducted.

Evidence was introduced to establish that at the time of the offenses appellant was in training to be a military policeman and knew the victim's husband. At one time, appellant had been assigned to patrol the remote area where the attack likely occurred. Although the forensic evidence was inconclusive or negative, other circumstantial evidence also linked appellant to the crimes.

Appellant testified in his own defense and denied that he was the assailant. He swore that on the evening of April 20, 1983, he was out shopping for birthday presents for his wife. He testified that, after he purchased a foot massager at Dumfries Pharmacy, he drove to the Zayre's store in

---

2. The evidence presented at trial is detailed exhaustively in the opinion of the court below.

*United States v. Scott,* 21 M.J. 889 (N.M.C.M.R. 1986).

Woodbridge, Virginia, approximately 12 miles away. He contended that he arrived at Zayre's shortly after 8 p.m., browsed around for awhile, but purchased nothing except a medium coke at the fountain from an employee called "Pam." According to appellant, he left Zayre's at 8:30 or 8:35 p.m., stopped briefly at the Quickee Drive-In about 8:50 p.m., and arrived home before 9:05 p.m.

In order to corroborate appellant's alibi, Mr. Kuhnke called the Zayre's security guard as a witness. She testified that appellant was in the Zayre's store one night in the spring between 8 and 8:30 p.m. Although she had reviewed store security records and determined that she had arrested two shoplifters on April 20, she could not connect appellant's presence in the store with these events. Therefore, she was unwilling to "commit" herself "to a date."

Ms. Biller was not called as a witness. Her expected testimony was stipulated to as follows:

> On the evening of 20 April 1983, I was working as the soda fountain attendant at Zayre's Department Store in Woodbridge, Virginia. I was shown a picture of Corporal Scott and I do not remember seeing or talking with him in Zayre's on the evening of 20 April 1983.

A stipulation of expected testimony of the clerk at the Dumfries Pharmacy confirmed that appellant was in the pharmacy between 7:30 and 8 p.m. on April 20. Confirmation of appellant's presence in the pharmacy before 8 p.m. did not, of course, corroborate his testimony as to his whereabouts during the critical time between 8 and 9 p.m.

During argument on findings, trial counsel emphasized that the defense evidence failed to support appellant's claimed alibi. Ignoring his client's own alibi testimony, Mr. Kuhnke stated in his argument, "I admit that the defense did not prove an ironclad alibi case." He argued that the victim was mistaken in her identification of appellant as the assailant. However, he did not request a cautionary instruction on eyewitness identification, and none was given.

## D

### DuBay Hearing

Mr. Kuhnke testified at the post-trial evidentiary hearing that he "was convinced" appellant "was innocent; and that I could establish an alibi defense if I had to." He stated, however, that he did not promptly investigate, seek, or interview potential alibi witnesses, or pursue any alibi evidence because he believed that the case would never come to trial. In spite of the fact that the charges were actually referred to trial on August 10, 1983, he testified that he "assumed there was not going to be a trial until the 10th of September."

Mr. Kuhnke further testified that he decided to rely on the defense of alibi as the only defense. In this regard, he considered the security guard to be "an outcome determinative witness." He did not prepare her or any other witness for trial, however, because he "expected them to tell the truth." He did not consider it necessary to prepare appellant for his testimony on direct or for cross-examination "because he professed his innocence. He said that he had nothing to hide." He did not follow up on any information provided by Ms. Jackson and relied exclusively on her to develop the testimony of the potential alibi witnesses. Unfortunately, he never told her of this reliance.

Major Roach, the detailed defense counsel, testified that he and Mr. Kuhnke agreed between themselves that Mr. Kuhnke was lead counsel. Major Roach viewed his role in accordance with paragraph 46*d* of the Manual for Courts-Martial, United States, 1969 (Revised edition), in that he was to act as associate counsel and perform duties as assigned by the individual counsel. He testified that he was available and willing to provide any assistance requested by Mr. Kuhnke, but he was

not asked to investigate an alibi defense. On his own initiative, Major Roach did conduct a time and distance study of appellant's activities on the night in question. He provided the results to Mr. Kuhnke and this was the extent of his involvement in preparing the defense of alibi. He testified that, before and during the trial, he had no reason to believe that there was any problem with Mr. Kuhnke's representation. If he had been aware of a problem, Major Roach maintained that he would have felt an ethical obligation to say something first to Mr. Kuhnke and then to appellant.

At the *DuBay* hearing, Ms. Biller testified that she recognized appellant as having been in the store once during April of 1983, but was still unable to give a firm date. She could confirm that he purchased a coke from her sometime after 8 p.m. He was there while she was cleaning the grill, a procedure she routinely started about 8 p.m. She was never contacted by Mr. Kuhnke or Major Roach, and she was not asked to testify at trial.

The security guard testified at the *DuBay* hearing that at that time she could pinpoint April 20 as the night she saw appellant in the store. At the request of appellant's new counsel, she had checked her records thoroughly after trial and reviewed photographs of the two shoplifters she had arrested on April 20. She was now able to make the connection between April 20 and appellant's presence in the store. She explained her failure to thoroughly check her records before trial as being caused by her preoccupation with personal problems and the apparent lack of interest in this information by defense counsel. Although Ms. Jackson told her that she would be contacted by Mr. Kuhnke, she never heard from him and was unaware that she would be called as a witness until immediately before trial.

Ms. Ausby was not subpoenaed to testify. In fact, Mr. Kuhnke waited until the night before he wanted her to appear and then asked Ms. Jackson to contact her. Ms. Jackson was unable to locate Ms. Ausby until just a few hours before she was needed to appear in court. According to the guard, she was placed on the stand without ever having talked to Mr. Kuhnke.

E

*Conclusion*

■ Viewing Mr. Kuhnke's performance in light of the prevailing professional norms, we can only conclude that it falls far short of reasonable competence. A defense counsel has "the duty ... to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." ABA Standards, The Defense Function, Standard 4–4.1 (2d ed. 1979). In many cases, "[p]retrial investigation is ... the most critical stage of a lawyer's preparation." *House v. Balkcom,* 725 F.2d 608, 618 (11th Cir. 1984). Mr. Kuhnke admittedly failed to timely investigate an alibi defense, not due to strategic considerations, but due to the inexplicable hope that the case would not go to trial.

We do not fault Mr. Kuhnke's decision to proceed with alibi as the only defense. It was apparent, however, that the alibi would have to be corroborated by the testimony of store employees with whom appellant allegedly had uneventful and brief contact on the night of April 20th. Under these circumstances, prompt investigation of the defense was crucial. Although Major Roach was available to assist free of charge, Mr. Kuhnke neither requested him to investigate nor undertook any investigation of his own.

Under certain circumstances, it may be sufficient for defense counsel to rely on the information provided to him by his client or upon the investigation conducted by the Government. In this case, however, further investigation was clearly required. The NIS agents talked to only one employee at Zayre's, Ms. Biller, and attempted to

elicit identification by showing her one photograph of appellant. Mr. Kuhnke relied on the NIS interview with Ms. Biller and stipulated to her expected testimony without ever talking to her. The stipulation itself was not only of no assistance to the defense, but also it was susceptible to erroneous interpretation. Ms. Biller had indicated to Ms. Jackson that she did serve appellant a coke at Zayre's one night in April after 8 p.m., but she was unsure of the date. The stipulation was worded such that it could be interpreted to mean that she did *not* serve appellant in Zayre's on April 20th.

Moreover, reliance on the NIS investigation alone was unreasonable in this case because the NIS interviews did not result in any information helpful to the defense. It seems incredible that Mr. Kuhnke insisted at the *DuBay* hearing that he considered appellant to have had a viable alibi defense, yet he was content to rely on the fruitless results of the NIS investigation to support this defense.

Mr. Kuhnke's failure to promptly investigate was not the result of strategy or a reasonable decision not to investigate. Rather, it was simply the result of a lack of preparation. It was not until appellant contacted Ms. Jackson *5 months after the offense* that any investigation was conducted on behalf of the defense to develop the potential alibi.

When the belated investigation of the alibi defense was performed, it was conducted by a volunteer and not at the initiative of defense counsel. Ms. Jackson was not a professional investigator and was merely locating witnesses, not preparing them for trial. Furthermore, she was operating without guidance from Mr. Kuhnke. She told the potential alibi witnesses that Mr. Kuhnke would be contacting them and reasonably expected him to do so, but he never did.

Even though defense counsel's failure to promptly and adequately investigate or prepare was unreasonable, prejudice must have resulted in order to justify reversal. The Government argues, and the majority of the court below found, that appellant failed to affirmatively establish prejudice in view of the overwhelming evidence of guilt and the possibility that Ms. Ausby's post-trial version of events would be disbelieved by the factfinders at trial. As pointed out by appellant, however, the Government's evidence at trial was strengthened by the unpreparedness and lack of investigation by defense counsel. This deficiency casts doubt on the reliability of the adversarial testing process of the trial.

Furthermore, the defense of alibi is a complete defense. If the members had believed that appellant was in Zayre's at the time Mrs. Street testified she was abducted, they may have concluded that Mrs. Street was mistaken in her identification of appellant as the assailant. As the victim was required to make an interracial identification of a stranger she had encountered only once, at night, under stressful conditions, a cautionary instruction on eyewitness identification was particularly appropriate in this case. *See United States v. McLaurin*, 22 M.J. 310 (C.M.A. 1986). However, such an instruction was neither given nor requested.

We cannot say that the case against appellant could have withstood introduction of the alibi testimony readily discoverable at the time of trial and subsequently introduced at the *DuBay* hearing. Moreover, it is for the triers of fact to determine whether Ms. Ausby's improved recollection is credible.

The decision of the United States Navy-Marine Corps Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

Chief Judge EVERETT concurs.

SULLIVAN, Judge (concurring in part and dissenting in part):

I concur with the excellent opinion of my Brother, Judge Cox, and only dissent on the remedy to be taken. In my view, justice requires that the truth be determined at a new court-martial. Article 67(e), Uniform Code of Military Justice, 10 U.S.C. § 867(e), indicates that this Court may order a rehearing if the findings and sentence are set aside. In this case, I would order a rehearing. If the convening authority does not want to retry this case, the convening authority can dismiss the charges against appellant. Art. 67(f).